IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-00685

KILLIAN CONNALLY

    Plaintiff,

vs.

BLUE STAR RECYCLERS, a Colorado non-profit corporation,

    Defendants.

_____

## COMPLAINT
_____

Plaintiff, Killian Connally ("Connally"), by and through his undersigned attorney, brings this Complaint against Defendant, Blue Star Recyclers ("Blue Star"), and states as follows:

## NATURE OF ACTION

1. Connally brings this action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a) and alleges interference with his rights thereunder by his former employer.

2. Connally has also contemporaneously filed an administrative Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), in which he has alleged that Blue Star discriminated and retaliated against him based on his disability. Connally will seek leave to amend his complaint to add that claim upon the completion of the administrative process required for the charge, and his receipt of a Notice of Right to Sue from EEOC.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that Plaintiff's claims arise under the FMLA, 29 U.S.C. § 2601, *et seq.*

4. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in this District and because McKinney does business and is located in this District.

5. This Court has personal jurisdiction over Blue Star because it does business and is found in the District of Colorado, and because the claims set forth herein arise, in whole, from events that occurred in the District of Colorado.

## PARTIES

6. Connally is an adult citizen of the State of Colorado and resides in Morrison.

7. Blue Star is a Colorado nonprofit corporation doing business at its locations in Denver, Boulder, Colorado Springs, and Basalt.

## FACTS

8. Connally worked for Blue Star from June 24, 2019 to February 8, 2021.

9. Blue Star employed Connally as a Lead Driver at its Denver location.

10. At all relevant times, Blue Star employed 50 or more employees within 75 miles of Connally's worksite at its Denver location.

11. Blue Star initially paid Connally $20/hour, and then raised him to $21/hour in approximately late June 2020 after he had completed one full year of employment.

12. Connally worked full-time for Blue Star, Monday through Friday.

13. By June 24, 2020, Connally had been employed by Blue Star for at least twelve (12) months and had worked at least 1,250 hours for Blue Star during the twelve (12) month period preceding the events described herein.

14. Connally reported to and was directly supervised in his employment with Blue Star by Zachary Bowen ("Bowen").

15. Connally's job performance was fully satisfactory.

16. Blue Star paid Connally bonuses in compensation based on his job performance.

17. Blue Star provided Connally with health, vision, and dental insurance coverage.

18. Connally accrued paid time off ("PTO") according to a formula set by Blue Star.

19. During the period of approximately six months prior to January 17, 2021, Connally experienced intermittent lower back pain on several occasions.

20. On those occasions, Connally requested leave for one day and was permitted to use paid time off for his absence.

21. On those occasions, Connally discussed his back condition with Bowen, during which they talked about the likelihood that Connally would probably need surgery.

22. On Sunday, January 17, 2021, Connally experienced severe lower back pain.

23. On Monday, January 18, 2021, Connally informed Bowen of his situation, and that he could not work.

24. Bowen told Connally to take that day and the rest of the week off, from Monday, January 18 to Friday, January 22, 2021, and to follow up with him that weekend.

25. Later that day, Connally's doctor diagnosed him with two extruded discs in his spine, and informed him that he would likely require surgery to correct this condition.

26. Connally immediately relayed the information from his doctor to Bowen. He also told Bowen that on Wednesday, January 20, 2021, his doctor had scheduled him for a medical procedure to receive an epidural steroid injection in his back.

27. On Wednesday, January 20, 2021, Connally received the epidural steroid injection in his back. He informed Bowen of this event.

28. Bowen directed Connally to "[s]tay home for the remainder of the week and rest up." Connally replied that "[g]etting that spinal shot was the most painful thing I've ever experienced", and thanked Bowen for his understanding and support. Bowen replied, "I'll do what I can for you."

29. On the weekend, Connally spoke to Bowen by telephone, during which he informed Bowen that his condition had not improved and he was still not able to work.

30. Bowen directed Connally to take the second week off, from Monday, January 25, to Friday, January 29, 2021.

31. At nearly noon on Monday, January 25, 2021, Connally told Bowen he was going back to the emergency room. He reported that he could not sleep, and that his pain was even worse. He stated that he had an appointment with a surgical tech (i.e., pre-evaluation for corrective back surgery) on February 10, 2021, but that due to his condition he might be able to move it up to that day.

32. On or about Monday, January 25, 2021, Bowen emailed Connally a "Physician/Health Care Provider Form", and directed him to have it completed.

33. In part, the "Physician/Health Care Provider Form" Bowen sent to Connally asks questions about: whether the "patient" (i.e. Connally) has a possible disability (within the

meaning of the Americans with Disabilities Act); whether he is able to perform work of any kind; whether he can perform the essential functions of his job (after reviewing the employer's job description of the employee's position); and whether he requires assistance or accommodation in performing the essential functions of his job.

34. Bowen did not provide Connally with any job description to accompany the form.

35. Connally provided the disability form to his doctor. However, his doctor did not complete the form because Connally needed surgery. No accommodation was possible until after Connally underwent surgery and recovered from that procedure.

36. On Tuesday, February 2, 2021, Connally told Bowen that he was feeling a little better and was going to try to return to work the next day. However, he also told Bowen that he had lost feeling in his foot.

37. Bowen responded that Connally would not be permitted to return to work "until we've received that paperwork from your doctor" (referring to the disability form Bowen had provided to Connally). Bowen also remarked, "it's probably unsafe for you to work if you've lost feeling in your foot." Bowen also told Connally that "[w]e have to run the paperwork through ERC before you can come back."

38. "ERC" refers to Employer Resource Council, a third-party professional employer organization that provides human resources and payroll administration to Blue Star.

39. On February 3, 2021, Connally told Bowen that he attempted to get the disability form completed by his doctor, but that when he told his doctor's office about the numbness in his foot, they indicated they would not clear him to return to work. Bowen acknowledged this information, and directed Connally to send the paperwork.

40. On Monday, February 8, 2021, Bowen called Connally and told him that his employment was terminated.

41. Connally immediately sent Bowen a message with information about employer compliance with the FMLA. He also told Bowen that his doctor was filling out "FMLA forms" today. Connally told Bowen, "I didn't think I would need them cause I didn't think I would be fired over this". Bowen replied, "That's the problem. You didn't send ANY paperwork including FMLA information or otherwise. You've been asked many times and never did anything. Therefore, your situation falls under 'excessive absenteeism'..."

42. On Tuesday, February 9, 2021, instead of completing the incorrect disability form, Connally's doctor provided him with a completed Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act), i.e. the standard U.S. Department of Labor form WH-380-E for FMLA leave requests.

43. At 9:24 a.m. on February 9, 2021, Connally emailed the FMLA form to Bowen.

44. At 12:49 p.m. the same day, Bowen told Connally that his FMLA was denied, and that if had any issues, to contact ERC.

45. Connally asked Bowen how could his leave be denied, to which Bowen replied: "According to ERC: In Killian's case, we are denying his FMLA for a couple of reasons: 1) he submitted the documentation after termination, 2) there are date discrepancies within the document he provided."

46. Prior to receiving the FMLA medical certification form from his doctor, at no time did Bowen, ERC, or any other representative or agent of Blue Star ever mention anything about the FMLA to Connally.

47. On February 9, 2021, Connie Rose of ERC sent Connally two FMLA-related documents: first, a U.S. Department of Labor Form WH-281, Notice of Eligibility & Rights and Responsibilities under the Family and Medical Leave Act. That form stated that on February 9, 2021, "we" (i.e. Blue Star and ERC) learned that [Connally] need[ed] leave beginning on January 19, 2021 for … [his] own serious health condition. Section 1 of the form indicates that Connally was <u>eligible</u> for FMLA leave. Section II of the form indicates that <u>no</u> additional information was requested.

48. The second form was a U.S. Department of Labor Form WH-382, Designation Notice under the Family and Medical Leave Act. Section I of that form indicated that Connally's FMLA leave was <u>not</u> approved because of "Discrepancies in the Certification of Health document received 2/9/21". However, the form does not provide any further explanation of such alleged "discrepancies". Section II of the form, which discusses the employer's request or need for additional information due to incomplete or insufficient medical certification, were left blank.

49. As of the second week of his final absence from employment, beginning the week of January 25, 2021, Connally had exhausted all of his accrued PTO.

50. However, Blue Star continued to pay Connally for 37.50 hours per week, described on his pay stubs as "vacation leave", until the date of his termination.

**FIRST CAUSE OF ACTION:**
**INTERFERENCE WITH PLAINTIFF'S EXERCISE**
**OF RIGHTS UNDER THE FMLA, 29 U.S.C. § 2615(a)(1)**

51. Connally incorporates by reference all preceding paragraphs of this Complaint.

52.     Blue Star is engaged in "commerce" and employs a total of 50 or more employees maintained on its regular payroll, at its Denver location and the Colorado Springs and Boulder locations, which are within 75 miles of the Denver location.

53.     Blue Star is a covered "employer" as defined by the FMLA. 29 U.S.C. § 2611(4)(A)(i).

54.     Blue Star was Connally's employer within the meaning of 29 U.S.C. § 2611(4).

55.     Connally was an "eligible employee" as defined by the FMLA. 29 U.S.C. § 2611(2)(A).

56.     The FMLA prohibits an employer from interfering with the exercise of or the attempt to exercise any right provided by the FMLA. 29 U.S.C. § 2615(a)(1).

57.     At all relevant times, Blue Star was fully aware of Connally's need for leave to receive medical care for his back condition, including his initial treatments and upcoming surgery and recovery.

58.     The condition caused by the extruded discs in Connally's spine was a serious health condition that rendered him unable to perform the functions of his position for more than three consecutive full calendar days.

59.     Between Monday, January 18 and Monday, February 8, 2021, Blue Star acquired knowledge and enough information to determine that Connally had a qualifying reason for FMLA leave.

60.     Based on that adequate knowledge and information, Blue Star was required to notify Connally of his eligibility to take FMLA leave, and to designate Connally's leave as FMLA-qualifying. 29 C.F.R. §§ 825.300(b)(1) and (d)(1).

61. Blue Star did not timely, or ever during his employment, notify Connally of his eligibility for FMLA leave, and did not designate his leave as FMLA-qualifying.

62. Blue Star's actions were intended to avoid its responsibilities under the FMLA.

63. The medical certification for FMLA leave completed by Connally's doctor provided a complete and sufficient certification. 29 C.F.R. § 825.305(c).

64. Blue Star and ERC did not ever advise Connally of the anticipated consequences of failure to provide adequate medical certification of his need for FMLA leave.

65. In fact, Blue Star and ERC did not ever request medical certification of Connally's need for FMLA leave. Connally and his doctor provided it to Blue Star *sua sponte*.

66. If Blue Star and/or its agent ERC believed that Connally's FMLA medical certification was incomplete or insufficient, they were required to provide Connally with seven calendar days to cure any such alleged deficiency via a resubmitted certification. 29 C.F.R. § 825.305(c).

67. Blue Star and ERC did not allow Connally the required opportunity to cure the certification he provided. 29 C.F.R. § 825.305(d).

68. Any violations of the U.S. Department of Labor regulations implementing the FMLA (including but not limited to the regulations specifically cited in the above paragraphs) constitute interfering with, restraining, or denying the exercise of rights provided by the Act. 29 C.F.R. § 825.220(b).

69. By failing to notify Connally that he had a qualifying reason for FMLA leave, and to designate Connally's leave as FMLA-qualifying, Blue Star willfully interfered with,

restrained and denied Connally's exercise of his rights as guaranteed by the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

70. By failing to properly request medical certification, and by denying Connally the opportunity to cure any alleged deficiencies in the FMLA medical certification that he did provide, Blue Star willfully interfered with, restrained and denied Connally's exercise of his rights as guaranteed by the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

71. By denying Connally's request for FMLA leave, and terminating Connally's employment during his absence on FMLA-qualifying leave, Blue Star willfully interfered with, restrained and denied Connally's exercise of his rights as guaranteed by the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Killian Connally, respectfully requests judgment and prays for the following relief:

A. Damages equal to the amount of wages, salary, employment benefits and other compensation denied or lost to him since the termination of his employment, together with interest thereon, pursuant to 29 U.S.C. §2617(a)(l)(A)(i)(I) and (ii).

B. An additional amount as liquidated damages equal to the amount of damages and interest awarded as requested in paragraph (B) above, pursuant to 29 U.S.C. § 2617(a)(l)(A)(iii).

C. Front pay in lieu of reinstatement of Plaintiff's employment.

D. Future economic damages until Plaintiff is able to fully mitigate his damages.

E.    Plaintiff's costs of this action, reasonable attorney fees and reasonable expert witness fees, pursuant to 29 U.S.C. § 2617(a)(3); and

F.    Such other legal and equitable relief as this Court deems just and proper.

Dated this 8th day of March, 2021.

                                Gary Kramer Law, LLC

                                */s/Gary M. Kramer*_____
                                Gary M. Kramer
                                1465 Kelly Johnson Blvd, Suite 210
                                Colorado Springs, CO  80920
                                Tel (719) 694-2783
                                Fax (719) 452-3622
                                gary@garykramerlaw.com
                                Attorney for Plaintiff, Killian Connally